# Southern Railway Co. *v.* Wallace.

*Failure to Deliver Freight.*

(Decided November 21, 1911. 56 South. 714.)

1. *Carriers; Live Stock; Non-Delivery; Excuse.*—Where a shipper contracted for the transportation of certain cattle and a horse in one car, but the shipment of the cattle was prevented by a legal quarantine, and the shipper refused to permit the horse to be shipped separately, he could not recover against the carrier, for a failure to deliver the horse at destination.

2. *Same; Action; Form.*—Where the carrier was unable to ship the stock to destination on account of a legal quarantine, whereupon, the carrier shipped them back to the original shipping point, and tendered them to the shipper who declined to receive them, and directed the carrier to do whatever it saw fit with them, and the carrier sold the stock, and held the money for the shipper, the shipper could not recover as for a conversion of the stock, at the original shipping point.

3. *Same; Right of Action.*—Where stock was shipped, but on account of a legal quarantine, could not be sent through to destination, and the shipper directed that the stock be returned to the

[Southern Railway Co. v. Wallace.]

original shipping point, from an intermediate point, he was not entitled to recover from the carrier for their conversion at such intermediate point.

4. *Same; Connecting Carrier; Failure to Receive; Duty of Initial Carrier.*—Where a connecting carrier refuses to receive live stock, or other freight, it is the duty of the initial carrier to notify the consignor, so as to enable him to give further shipping directions, unless the freight is of such a perishable nature that it would probably be injured by taking of time necessary to give such notice.

5. *Damages; Evidence; Contract of Carrier.*—Where it appeared that the carrier was not liable for a non-delivery, it was improper to permit proof of value of the property at the intended destination.

6. *Same.*—Where the conversion of the stock by a carrier occurred at an intermediate point, if it occurred at all, it was improper to admit evidence of the value of the stock at the point of final intended destination.

7. *Appeal and Error; Harmless Error; Evidence.*—Where the value of the stock at the point of final destination was greater than at an intermediate point, where the conversion occurred, if at all, the admission of evidence as to the value at such point was prejudicial, especially where it appeared that the value at destination was higher than at the intermediate point, or the original point of shipment.

APPEAL from Lauderdale Circuit Court.

Heard before Hon. C. P. ALMON.

Action by R. L. Wallace against the Southern Railway Company, for failure to deliver stock at point of destination. Judgment for plaintiff and defendant appeals. Reversed and remanded.

C. E. JORDAN, for appellant. A contract in violation of a criminal law cannot be made the basis of a recovery.—*W. U. T. Co. v. Young,* 138 Ala. 240; *Youngblood v. B. T. & S. Co.,* 95 Ala. 526; *W. U. T. Co. v. Walters,* 139 Ala. 652; *Boyette v. S. C. & O. Co.,* 146 Ala. 554; *McNeel v. Dunham,* 95 Am. St. Rep. 641. The Federal statutes prohibit interstate shipments of cattle at certain seasons.—10 Fed. St. Ann. 34, et seq. It becomes the duty of the shipper to obtain the necessary certificate and permission from the proper Federal authorities. —104 S. W. 778. The court erred in permitting value

to be shown at Memphis, the point of destination.—*Rodgers v. King,* 155 Ala. 544; *Davis v. Hurt,* 114 Ala. 146.

JOSEPH H. NATHAN, and A. E. WALKER, for appellee. A shipper may change or countermand his shipping directions at any time before delivery at point of destination, and if such re-delivery can be made without too much inconvenience or expense to the carrier, it must be done.—2 Hutch. on Carriers, secs. 660 and 735; *Melburn, et al. v. L. & N.,* 88 Ala. 448; *Deech v. Walker,* 14 Mass. 499. The carrier was guilty of conversion.—22 L. R. A. (N. S.) 1170. It was the duty of the carrier to notify consignor of the refusal of the connecting carrier to receive the goods, and ask for other instructions. —Sec. 6138, 6139, Code 1907. The general rule as to measure of damages in cases like the present will be found stated in 6 Cyc. 530.

MAYFIELD, J.—The facts of this case are, in short, and substantially, as follows: Appellee, a live-stock man, delivered to appellant, as a common carrier, on the 7th of January, 1910, 72 head of cattle and 1 stallion, to be carried for hire from Florence, Ala., to Mc-Mullen, Mo. The shipment was transported to Memphis, Tenn., by appellant, where the cattle had to be delivered to the next connecting carrier, the Frisco Line, which was shown to be the only connecting carrier to which delivery could be made. The Frisco Line declined to receive the shipment on account of federal quarantine regulations which prohibited shipments of live stock from Alabama to Southern Missouri, the contemplated destination of this shipment. The shipper being present, and knowing of the refusal of the connecting carrier to receive or transport the shipment, without giving any specific instructions to the carrier,

went on to Van Duesen, Mo., with a promise, as he claims, that he would have the government man or the Frisco people deliver the stock to the shipper. The shipper also testified for him in this connection as follows: "I gave him my address and left. He asked me what to do with it (the shipment) in case he could not get it through. He said he would send it back to Florence. I objected to its being shipped back there. I told him, in case he could not get it through, to send it to St. Louis for immediate slaughter."

Mr. Gray, agent for the Southern Railway Company, as to the same transaction, testified as follows: "Shipment remained at Memphis in the H. T. Bruce stock pen from January 11th, at 9 :30 a. m., to January 13th, at 11 :00 a. m., and was cared for, watered, and fed, by H. T. Bruce & Co. at the expense of the owner. Cannot advise the length of time R. L. Wallace remained with the shipment in Memphis. Mr. Wallace was notified by myself personally that shipment in question could not be moved into the quarantined district of Missouri, from Florence, Ala., on account of his negligence in not obtaining from the inspector in charge of the quarantined district of Missouri proper certificate and permit allowing the entrance into said quarantined district. Mr. Wallace stated to me that he would go on to McMullen, Mo., and permit the cattle and horse to remain in possession of the carrier, declining to give me any definite instructions as to the disposition of the shipment. I do not know personally whether his intention in this respect was carried out or not, and whether the shipment was actually abandoned by him or not. The federal authorities permitted us to send the shipment back to Florence."

T. C. Rollins, agent of the stockyards at Memphis, testified as to the same matter as follows: "I knew this

shipment of cattle and the horse were reshipped to Florence, but I do not know by whose order. The railroad company—that is, the Southern Railway—suggested to R. L. Wallace that he allow them to ship the stallion on to destination. At first he talked as if he would consent to this, but he finally directed Mr. Gray, the agent of the Southern Railway at Memphis, to send the whole shipment back to Florence, Ala. I know that Mr. Wallace, the owner, was informed by the United States quarantine officer that the cattle would not go on to destination. The owner, R. L. Wallace, remained in Memphis for about one day after the shipment arrived, and then left, saying he was going to Florence, Ala. I have never seen anything more of him since. Mr. Wallace told me that he knew there was a quarantine against cattle going to McMullen, Mo., before he made the shipment, but the railroad company in Florence told him the shipment would go through all right."

The shipment was carried back to Florence, and there tendered to the shipper, who declined to receive it unless the carrier would pay him $500 damages, and stated to the carrier's agent that unless that was done he would not receive the shipment, and that the carrier could make such disposition of the shipment as it saw fit.

The complaint contained a great number of counts, but the plaintiff finally eliminated all except counts 6, 7, and 9, which were in code form. Counts 6 and 7 were in trover, for conversion of the shipment, one claiming as for the cattle and the other as for the horse, while count 9 was for the failure to deliver the horse.

The contract in question—whatever it may have been originally—being for the shipment of the cattle and the horse as one lot, and in one car, and shipment of the cattle being made impossible because in violation of

law, and plaintiff declining to allow the horse to be shipped separately (as shown by the testimony of Collins, which was not denied by plaintiff), under the undisputed evidence there could be no recovery under the ninth count.

There could be no recovery as for a conversion at Florence under counts 6 and 7, because the undisputed evidence shows that the carrier tendered the stock to the shipper and he declined to receive it, and directed the carrier to do whatever it saw fit, upon which the carrier sold the stock and held the money for the plaintiff—which was all that it could do.

This the plaintiff seems to concede, but he insists that the conversion occurred in Memphis, and upon this theory had the defendant's evidence excluded, as to what occurred after the shipment was returned to Florence, except that as to the bare fact of tender.

Touching whether or not there was a conversion of the stock at Memphis, most of the evidence in favor of the plaintiff was disputed. If the defendant's evidence was true, the plaintiff directed that the stock be shipped back to Florence in case it could not be sent to the intended destination. If this was the truth of the matter, there was no conversion in Memphis, and the court should not have excluded the evidence as to the transactions and conversations between the parties after the shipment arrived in Florence, upon the theory that the conversion had already occurred in Memphis, and that these conversations and transactions were thereafter incompetent and irrelevant.

It was likewise error, for the reason above shown, to allow the plaintiff to make proof of the value of the stock in Missouri, the point of intended destination, because, as we have shown, there could be no liability for failure to deliver, and none was sought to be fixed, as to the cattle.

As the conversion occurred in Memphis, if at all, evidence of the value of the stock in Missouri was not admissible for any purpose, and, it appearing that the value there was greater than in either Memphis or Florence, it is affirmatively shown to have been injurious to the defendant.

"Like every other person, the carrier is bound, both by duty and necessity, to respect and yield to the paramount public authority in power at the place where his undertaking is to be performed. If, therefore, without his fault or neglect the goods are lost or injured by the act or mandate of the public authority, the carrier should be excused, and such is the rule of law. If the goods, without his fault, are or become obnoxious to the requirements of the police power of the state, and are injured or destroyed by its authority, as in the case of the seizure or destruction of goods infected with contagious diseases, or of intoxicating liquors intended for use or sale in violation of law, the carrier cannot be held liable."—Hutchinson on Carriers, §§ 324, 325.

"Where plaintiffs shipped certain cattle and horses in the same car, and the carrier negligently unloaded the cattle in pens, by reason of which they were exposed to Texas fever, whereupon the connecting carrier refused to accept the cattle for shipment to their destination, but offered to ship the horses, which plaintiffs refused, they were not entitled to recover against the initial carrier for delay in shipping the horses, occasioned by their requirement that both horses and cattle should be shipped together."—*Missouri, K. & T. Ry. v. Wells,* 22 Tex. Civ. App. 255, 54 S. W. 939.

As the case must be reversed for the reason assigned, it is unnecessary to pass upon other questions, especially those of variance, and that, as to whether there can be a recovery as for conversion in Memphis, because that question is not properly presented on this appeal.

As to the duty of the initial carrier when the connecting carrier declines to receive the goods for further shipment, this court, in the case of *L. & N. R. R. Co. v. Duncan & Orr,* 137 Ala. 455, 34 South. 990, a case similar to this, said: "On the state of facts existing with reference to this consignment after the car had reached Montgomery, and the Plant System had refused to accept it for carriage to Greenville, if that company did so refuse—and on this issue it seems to us that the evidence was all with the defendant—it was the defendant's duty to give notice of that fact to the consignors to the end that they might give further directions as to routing the consignment, unless the property was of such perishable nature as that the time necessary to give such notice and to receive such instructions would have caused a delay in forwarding calculated to injure or destroy it. We do not find on the evidence in this record that any such delay would have been entailed by taking the time necessary to these ends, or, at least, we may say that, with this issue properly in the case, it would be open to the jury to find that the defendant was remiss of its duty in this connection. Live stock is, of course, perishable in a general sense; but we apprehend that horses and mules released from the car and in a pen in Montgomery, as these were, were in no danger of perishing while the defendant was communicating with the consignors at Birmingham and receiving their reply."

Reversed and remanded. All the Justices concur.