ST. LOUIS–SOUTHWESTERN RY. CO. v.
FARRELL et al.
No. H–465.

United States District Court
E. D. Arkansas, E. D.

Aug. 22, 1953.

Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., for plaintiff.

Sharp & Sharp, Brinkley, Ark., for defendants.

LEMLEY, Chief Judge.

This cause having been submitted to the Court upon the record herein; certain written briefs filed by the parties in connection with the plaintiff's motion for summary judgment, documentary evidence introduced by the parties, and oral testimony, and the Court having considered the same, and being well and fully advised, doth make the following. Findings of Fact, Conclusions of Law, and Comment thereon, to wit:

### Findings of Fact.

1. This is an action brought by the plaintiff to recover certain demurrage charges alleged to be due from the defendants with respect to certain freight cars transported to the defendants over the plaintiff's lines loaded with gravel for use by the defendants in performing a certain sub-contract within the Pine Bluff Arsenal in Jefferson County, Arkansas. The shipments involved herein were made during the months of July to October, inclusive, in the year 1951. The plaintiff claims that the shipments were delivered to the defendants at Baldwin, Arkansas, the interchange point serving the Pine Bluff Arsenal; that the defendants failed to release the cars within the free time allowed by the applicable demurrage tariffs, and that they are consequently liable for demurrage for the time in excess of the allowed free time during which the cars were held. There is no dispute as to the amount of demurrage which is due if in fact the defendants are liable for demurrage; but the defendants contend that they are not liable to the plaintiff in any sum whatever.

2. The plaintiff herein is a Missouri corporation, qualified to do business and doing business in Arkansas; it is a common carrier by rail both in interstate and intrastate commerce. Defendants herein are individual citizens of states other than Missouri, and the amount in controversy, exclusive of interest and costs, exceeds $3,000. Defendants are general partners doing business under the firm name of Clark-Farrell Company.

3. Certain facts have been stipulated by the parties, and the Court finds those facts as stipulated.[1]

4. During all times pertinent to this action the United States Government was engaged in the construction of the Pine Bluff Arsenal in Jefferson County, Arkansas, with the Blaw-Knox Company as its prime contractor; the arsenal area is quite extensive, and considerations of security required that ingress to and egress from said area be restricted, and that the movements of sub-contractors and their personnel within the area be likewise restricted. Prior to the commencement of the construction of the Arsenal the Missouri-Pacific Railroad had a switching point known as Baldwin, Arkansas; at some time prior to the transactions involved in this case, the plaintiff constructed a branch line from Pine Bluff to Baldwin for the purpose of delivering carloads of freight destined for the Arsenal and contractors employed within the arsenal area. Baldwin is itself within the arsenal area or reservation, and the plaintiff's branch line is crossed by the fence which surrounds said reservation; there is a gate across the track at the point where the track is intersected by the fence, which gate is kept locked. Employees of the plaintiff delivering freight to Baldwin have a key to the lock on said gate, and when one of plaintiff's trains enters or leaves the reservation, it is necessary that this gate be unlocked and opened; it is closed and re-locked after the train has passed.

In order that carload shipments of freight might be delivered to sub-contractors within the arsenal area, the Government constructed and operated a system of railroad tracks within the reservation which connected with the lines of the plaintiff and of the Missouri-Pacific at Baldwin. The Government likewise constructed at Baldwin five side tracks which connected with the lines of the plaintiff and of the Missouri-Pacific and with the main line of the Government trackage. Said side tracks are hereinafter referred to as "interchange tracks". Train crews of the carriers just referred to were permitted to enter the arsenal area and to penetrate therein as far as Baldwin for the purpose of placing loaded freight cars upon the interchange tracks and for the purpose of picking up empty cars which had been put back on the interchange tracks, but no further. All switching and car spotting within the arsenal area beyond Baldwin was done over the Government owned tracks and with Government owned equipment, operated by employees of the Corps of Engineers of the United States Army.

[1] In the stipulation the defendants specifically admitted the facts set forth in plaintiff's requests for admissions, No. 2 and No. 3, which requests were as follows: "*Request No. 2.* The gravel shipped from Bearden, Arkansas to the defendants was being purchased by the defendants from the owner and producer of the gravel at Bearden, which owner and producer was the shipper, and the defendants were the consignees."; "*Request No. 3.* The gravel was loaded at Bearden by the shipper who tendered same to plaintiff for shipment under bill of lading to the defendants at Baldwin, Arkansas." When the case was tried, counsel for the defendants offered to prove that the carloads of gravel were consigned to "U. S. Corps of Engineers, c/o Clark-Farrell Co., Baldwin, Arkansas." Objection having been made by counsel for the plaintiff, we declined to permit the stipulation to be varied by such proof, but we do not believe that the outcome of the case would have been affected had we ruled otherwise since the gravel belonged to the defendants and was intended for them; the Corps of Engineers had no proprietary interest in said gravel during its shipment. Other facts which are set forth in the stipulation, and which are necessary to our decision, are either specifically covered by our own findings or referred to in our comment.

No loading or unloading of cars was done at Baldwin. The Government's equipment above referred to, in addition to tracks, consisted of three Diesel locomotives, each of which had the letters "U. S. A." painted on its side. The interchange tracks, sometimes referred to in the evidence as the "classification yards", were located upon Government property, were part of the rail system within the arsenal area, and were wholly under Government control.

When a carload of freight destined for a sub-contractor within the arsenal area was received by the plaintiff at Pine Bluff, the car would be hauled to Baldwin over the plaintiff's branch line; upon reaching Baldwin such car would be placed upon one of the interchange tracks to the right of the branch line, and the plaintiff's switch engine would cut loose from it; plaintiff's switching crew would then pick up any empty car or cars which might be upon the interchange track to the left of the branch line which was assigned to the plaintiff and would return with such car or cars to Pine Bluff. The loaded car which had been left on the interchange track would be picked up by one of the Government switch engines and hauled over the Government trackage to the unloading area assigned to the sub-contractor to whom such car was consigned. After the sub-contractor had unloaded said car, he would notify the proper employee of the Corps of Engineers, and thereafter the empty car would be picked up by one of the Government locomotives and hauled back to Baldwin where it would be placed upon the proper outgoing interchange track to be picked up by the Missouri-Pacific, or by the plaintiff as the case might be. One of the two outgoing interchange tracks was assigned to the Missouri-Pacific, and the other was assigned to the plaintiff. Accurate records were kept of the times at which the carriers' locomotives cut loose from loaded freight cars on the inbound interchange tracks and of the times at which empty cars were placed on the outgoing interchange tracks.

Between the time that a loaded freight car was placed on one of the inbound interchange tracks and the time it was placed as an empty upon the outbound interchange track, it was entirely subject to the control of the Corps of Engineers, except for such period of time as the consignee might spend in the actual unloading of it; neither the carrier nor the consignee had any control over the time at which such car would be actually delivered at the consignee's unloading area or over the time at which such car, after being unloaded, would be picked up by the Corps of Engineers and placed upon the outbound interchange track.

5. Some time prior to July 1, 1951, the defendants entered into a sub-contract with Blaw-Knox Company, the performance of which contract called for the use of large quantities of gravel within the arsenal area; it was contemplated that the gravel would be shipped to the defendants by rail, and an unloading facility within the arsenal area known as "Dock 'I'" was assigned to them; this facility was some distance from Baldwin. Defendants purchased their gravel at Bearden, Arkansas, and it was shipped to them over the plaintiff's line of railroad in Arkansas; plaintiff delivered the cars destined for the defendants to the interchange tracks at Baldwin, and said cars were ultimately delivered at defendants' unloading facility by the Government switch engines; after the cars were unloaded, they would be picked up by the Government switch engines and returned to the interchange tracks to be hauled away by the plaintiff. As in the case of other sub-contractors working in the arsenal area, the defendants had no control over the switching of their cars by the Corps of Engineers, nor did the plaintiff have any control over such switching. Neither the plaintiff nor the defendants had any unloading facilities at Baldwin itself, nor was there any manner whereby cars destined for the defendants to reach them other than the method outlined above. No notice was ever given to the defendants of the time at which one of their cars was placed on the interchange tracks. While the defendants have alleged a special agreement with the plain-

tiff that they would be notified of the arrival of inbound cars at Baldwin, there is no evidence of any such agreement.

6. Defendants maintained a crew at the unloading facility above referred to, and this crew worked six days a week. The plaintiff moved cars over its branch line to and from Baldwin six days a week, and had its switching crew make as many trips a day as might be necessary. The Corps of Engineers, however, operated its switch engines only five days per week and eight hours per day.

7. At the time they entered into their sub-contract with Blaw-Knox Company, the defendants were not familiar with the method of handling freight cars at the Arsenal; but it is obvious, and the Court finds, that they became familiar with it practically as soon as their actual performance of their sub-contract began. In this connection, as stated, the Government-owned locomotives were plainly marked "U. S. A.", and, furthermore, the undisputed testimony is to the effect that after a car was unloaded, the defendants' representative would communicate with the Engineers relative to picking it up, rather than with any employee or representative of the plaintiff.

8. All of the shipments involved in this case were intrastate shipments; the defendants paid all regular freight charges, except the demurrage which was demanded from time to time, and also made additional payments to the Corps of Engineers for services performed by it in hauling, spotting, picking up, and returning the approximately 1,500 cars delivered to them at the rate of $7 per car and $3 extra shipping charges.

9. Freight Tariff 4-Z and Freight Tariff No. 4, which contain demurrage rules and rates applicable to all points on the plaintiff's lines, and which the plaintiff contends are the tariffs which govern the rights of the parties in this case, have been duly filed and published both with the Interstate Commerce Commission and with the Arkansas Public Service Commission, which is the regulatory body having jurisdiction in Arkansas over common carriers by rail; said tariffs have never been suspended by the Arkansas Public Service Commission or by the Interstate Commerce Commission; as far as this case is concerned, at least, Tariff 4-Z and Tariff 4 are identical; Tariff 4 replaced Tariff 4-Z effective August 15, 1951. During all the times here pertinent, I. C. C. Service Order No. 865 and I. C. C. Revised Service Order No. 856, relating to demurrage, have been in force and effect, and have been on file with the Arkansas Public Service Commission. These tariffs and service orders have been introduced in evidence in this case. When the tariffs were filed with the Arkansas Public Service Commission, they were marked "Received" by the Rate Division of said Commission; no hearing of any type was held by the Public Service Commission with reference to either of said tariffs or service orders, nor has the Public Service Commission ever held any hearing where the rights of consignors or consignees of freight into or out of the Pine Bluff Arsenal were involved.

The tariffs above referred to state that they apply at "All Points On Railroads Parties Hereto (Except As Otherwise Provided Herein)"; the plaintiff is a party to said tariffs, and Baldwin is a point on its line of railroad; said tariffs contain no exceptions which would prevent them from applying at Baldwin. There is no evidence from which. the Court can find that the application of said tariffs to cars consigned to Baldwin and delivered upon the interchange tracks at that place for ultimate delivery within the arsenal area by the Corps of Engineers is so unreasonable, unjust and inequitable as to make said tariffs, when so applied, unlawful, as the defendants contend.

10. On May 8, 1951, the parties hereto entered into the "average agreement"[2]

2. Rule 9 of the applicable tariffs permits the carrier and the consignee or shipper to enter into an "average agreement" under which demurrage is computed "on the basis of the average time of detention to all such cars released during each calendar month". Where a freight car is held for longer than the allowed free

permitted by Item 540, Rule 9, of the tariffs above referred to; demurrage debits were charged against the defendants under this agreement in many instances, but, on the other hand, in many instances the defendants earned substantial credits for cars released before the expiration of the first twenty-four hours of free time. The demurrage here claimed has been properly computed under the average agreement, and the defendants have been allowed proper offsets for their demurrage credits in accordance with the provisions of the average agreement. It has been stipulated, however, that the defendants are not to be held liable for demurrage merely because they entered into the average agreement.

11. The only way that the plaintiff could effect delivery of loaded cars to the defendants was by placing them on the interchange track inside the Arsenal grounds; all cars placed on the interchange track were for use in the Arsenal area, either for loading or unloading. The unloaded cars did not become available to the plaintiff for further use until returned to the interchange track by the Arsenal switching crew.

12. There is no evidence from which the Court can find that any of the demurrage involved here was proximately caused by an act of God, inclement weather or a *vis major,* or that any of the exceptions contained in Rule 8 of the tariffs is applicable to any of the cars involved in this case, or that the defendants ever undertook to take advantage of any of said exceptions by filing a timely claim with the plaintiff, as required by the tariffs. Aside from the foregoing, there is no evidence from which the Court can find that in any instance the failure to return the car or cars to the interchange tracks within the allowed free time was due to the bunching of cars, or that if any bunching took place, it was the fault of the plaintiff.

13. The defendants contend, among other things, that the failure to return the cars to the interchange tracks within the free time allowed by the applicable tariffs was not their fault, but was due solely to the fault of the employees of the Corps of Engineers. The defendants have failed, however, to establish that the incidence of demurrage was due solely to the fault of the Corps of Engineers. It is doubtless true that some, and perhaps most, of the demurrage involved in this case accrued as a result of the switching practices of the Corps of Engineers; but such practices were not the proximate cause of all of the demurrage which has accrued in this case. In this connection the defendant's own unloading foreman testified that on one occasion the defendant's unloading equipment was broken down for two entire days; certainly, the delay caused by that breakdown cannot be attributed to the employees of the Government. Nor did the switching methods pursued by the Corps of Engineers by any means result in demurrage claims with respect to all of the cars destined for the defendants which were handled by the employees of the Corps, as is demonstrated by the fact that the defendants earned a very substantial number of demurrage credits by reason of cars in numerous instances being put back on the interchange tracks within less than twenty-four hours after original placement thereon. The situation, as we find it, was that some of the demurrage here claimed was due to the fault of the Government, and some was due to the fault of the defendants; the defendants did not attempt to establish this particular contention on an individual car basis, and we have no way to tell what portion of the claimed demurrage was caused by the fault of the Government, or what portion was caused by the fault of the defendants. No showing at all has been made that any of this demurrage resulted from the fault of the plaintiff.

time, demurrage debits are charged against the shipper or consignee, the number of such debits depending upon how long a time the car is detained beyond the allowed free time; a demurrage credit is allowed for each car released before the expiration of the first 24 hours of free time. The tariff sets out a detailed method of computing demurrage under the "average agreement", and prescribes a form for such agreements.

Moreover, the defendants have failed to show that they used due diligence to avoid demurrage; in this connection, while it appears that the defendants did make some representations to Blaw-Knox for the purpose of securing the more expeditious handling of their cars by the Corps of Engineers, there is no showing that the defendants ever undertook to control the flow of gravel between Bearden and Baldwin, although they obviously must have become thoroughly acquainted with the Government's method of operations very early in the performance of their sub-contract, and although by the end of the first month of their performance they must have known that cars were not being returned to the interchange tracks within the allowed free time, and that the railroad was demanding demurrage. · Furthermore, while, as stated, the parties have agreed that the defendants are not liable for demurrage merely because they entered into the average agreement, the very existence of that agreement shows that the possibility of the incidence of demurrage was within their contemplation as early as May 8, 1951, when said agreement was executed.

## Conclusions of Law.

1. This court has jurisdiction of this cause and of the parties hereto.

2. Freight Tariff No. 4–Z and Freight Tariff No. 4 apply to Baldwin, Arkansas, and to shipments delivered by carriers on the interchange tracks at that point for ultimate physical delivery to sub-contractors and other persons within the area of the Pine Bluff Arsenal; said tariffs having been published and filed with the Public Service Commission of the State of Arkansas, and not having been suspended by said Commission or by the Interstate Commerce Commission, supersede the statutory demurrage rules prescribed by Act 193 of the Acts of the General Assembly of the State of Arkansas for the year 1907[3], and said statutory demurrage rules are inapplicable here. Said tariffs, as modified by I. C. C. Service Order No. 865 and by Revised I. C. C. Service Order No. 856, both of which service

orders have been filed with the Public Service Commission of the State of Arkansas, prescribe the demurrage rules and rates applicable to this case, and the rights of the parties are to be determined thereby.

3. Under the tariffs delivery of the several freight cars involved in this case to the interchange tracks at Baldwin was delivery to the defendants, and no notice of the placement of such cars on said tracks was required to complete the delivery. Said cars were not re-delivered to the plaintiff until they were placed upon the outgoing interchange track by the Corps of Engineers.

4. The fact that defendants were unable to deliver the empty outgoing cars to the plaintiff except through the medium ˙of switching facilities of the ·Government does not relieve the defendants of the obligation to pay demurrage, nor the plaintiff of the requirement to collect it.

5. Assuming without deciding that a shipper or consignee is excused from liability for demurrage where his failure to release the car or cars in question is proximately caused by actions of Government employees over whom neither he nor the carrier has any control and whose actions he could not have reasonably foreseen or guarded against, the burden is upon the defendants to establish this affirmative defense by a preponderance of the evidence, and this they have failed to do. The evidence of the defendants fails to show that all of the demurrage involved in this case was due to the fault of the Government, and said evidence likewise fails to show what portion of the demurrage, if any, was due to the fault of the Government, and what portion, if any, was due to the fault of the defendants; this being true, any effort on the part of the Court to differentiate between demurrage due to the fault of the Government and demurrage due to the fault of the defendants would be pure speculation. Nor have the defendants shown that they could not have avoided at least a large portion of the demurrage incurred by the exercise of reasonable and ordinary diligence in con-

3. The sections of Act 193 of 1907 pleaded by the defendants are now codified as

Ark.Stats., 1947, §§ 73–1312, 73–1313, 73–1315, 73–1317 and 73–1320.

trolling the flow of gravel from Bearden to Baldwin.

6. Even if it be assumed that to hold the defendants liable for demurrage in this case will work a hardship on them or will be to some extent inequitable, such hardship or inequity under the law applicable to demurrage charges is insufficient alone to excuse the defendants from liability.

7. Plaintiff is entitled to judgment for the amount sued for, plus interest and costs.

### Comment.

The defendants, in resisting the plaintiff's claim have advanced certain contentions which we desire to comment upon in connection with our Findings of Fact and Conclusions of Law:

One of the defendants' primary contentions is that the demurrage rules applicable to the instant case are not to be found in the plaintiff's demurrage tariffs on file with the Arkansas Public Service Commission but, rather, in the provisions of Act 193 of 1907, which statute is, in effect, a comprehensive demurrage code enacted by the Arkansas Legislature, and which has never been repealed. It has been held by the Supreme Court of Arkansas, however, that when a carrier files a demurrage tariff with the regulatory body to which power has been given by statutes passed subsequent to 1907 to prescribe demurrage rules and regulations, which body is now the Arkansas Public Service Commission, the rules contained in such tariff become effective upon the date specified therein, unless suspended by such regulatory body, without the necessity of any formal investigation, hearing or order of approval, and supersede the statutory demurrage rules contained in the 1907 statute relied upon by the defendants. Spears v. Missouri-Pacific Railroad Co., 183 Ark. 945, 39 S.W.2d 727. As heretofore found by us, the tariffs and service orders relied upon by the plaintiff have at all times here relevant been on file with the Interstate Commerce Commission and the Arkansas Public Service Commission, and have never been suspended by either body. Hence, if these tariffs and service orders were applicable to cars delivered on the interchange tracks at Baldwin for ultimate physical delivery by the Corps of Engineers within the arsenal area, the rights of the parties must be determined by them rather than by the rules and rates prescribed by Act 193 of 1907. Said tariffs apply to all points on the plaintiff's line of railroad and Baldwin is a point on said line; the bills of lading described Baldwin as the destination of all of the cars involved in this case, and as far as the plaintiff was concerned, Baldwin was the delivery point of these shipments. Of course, neither the defendants nor the plaintiff had any unloading facilities at Baldwin, and it was necessary for the cars to be placed upon the interchange tracks constructed and controlled by the Government, but it is not unusual for freight cars to be delivered upon interchange tracks, and the tariffs specifically provide for such delivery. As Baldwin is a point on the plaintiff's line of railroad, we are of the opinion that the tariffs and service orders apply to Baldwin; and since Baldwin was the delivery point set out in all of the bills of lading involved in this case, we are satisfied that said tariffs and service orders are applicable here, and that the provisions of Act 193 of 1907 are not applicable.

Defendants next contend that the tariffs and service orders, when applied to cars consigned to and delivered at Baldwin for ultimate delivery within the restricted arsenal area, are so unreasonable, unjust and inequitable as to be unlawful. Said tariffs and service orders are not unreasonable on their face, and no evidence has been introduced from which we can find that they are unjust, unreasonable or inequitable. In this connection, it should be kept in mind that the situation prevailing at Baldwin differs from situations prevailing at other interchange points only in that at Baldwin the switching and car spotting services were performed by the Government rather than by a private corporation or individual. There is no presumption that the Corps of Engineers cannot and will not handle cars as efficiently and expeditiously as a private individual or corporation, and the substantial credits earned by the defendants under the average agreement clearly demonstrate that in many

instances their cars were expeditiously handled. If in fact the Corps of Engineers was dilatory in the handling of cars, such dilatoriness would not affect the reasonableness or unreasonableness of the tariffs and service orders, although it might give to shippers and consignees some ground to apply to the Interstate Commerce Commission or to the Arkansas Public Service Commission for a modification of said tariffs and service orders. The defendants here were not the only contractors operating within the arsenal area, and it appears from the evidence that there were also certain private industries operating therein; cars destined for these other contractors and for the private industries were handled in exactly the same way as the defendants' cars were handled. From a practical standpoint we know that many inbound shipments of freight were interstate in character; these tariffs have been approved by the Interstate Commerce Commission, and the service orders were issued by it; there is no showing, however, that any consignee or shipper within the arsenal area has ever applied to the Commission for any relief, either prospective or retroactive, from these tariffs, which apply to all alike.

■ Even if it be assumed that the tariffs and service orders in question bore more harshly upon the defendants than upon other contractors and industries within the arsenal area, and even if it be further assumed that the peculiar circumstances of the defendants were such that demurrage would inevitably be incurred with respect to certain cars, such facts would not render the tariffs and service orders illegal. In the case of Pennsylvania R. Co. v. Kittaning Iron & Steel Mfg. Co., 253 U.S. 319, 40 S.Ct. 532, 64 L.Ed. 928, the Supreme Court of the United States pointed out that demurrage rules are based upon an "external standard", that is to say, that they do not take into account the circumstances of particular shippers; that the free time allowed by the Uniform Demurrage Code was that period which, in the opinion of the draftsmen of the Code, "was reasonably required by the average shipper to avail himself of the carrier's service under ordinary circumstances." 253 U.S. at page 323, 40 S.Ct. at page 533. It was further said: "The framers of the Code made no attempt to equalize conditions among shippers. It was obvious that the period fixed was more than would be required by many shippers most of the time, at least for certain classes of traffic; and that it was less than would be required by some shippers, most of the time, for any kind of traffic. Among the reasons urged for rejecting consideration of the needs or merits of the individual shipper, was the fear that, under the guise of exempting shippers from demurrage charges because of conditions peculiar to them, unjust discrimination and rebates to favored shippers might result." 253 U.S. at pages 323–324, 40 S.Ct. at page 533.

■ Defendants next argue that the plaintiff never delivered the cars to them, and that, therefore, it cannot collect demurrage. There is no merit to this contention; as we have found, these cars were consigned to Baldwin and they were delivered there; delivery at Baldwin was the only type of delivery which the plaintiff could make to the defendants. Rule 3, Section E, of the tariffs provides in part that "* * * on cars to be delivered on interchange tracks of industrial plants performing the switching service for themselves or other parties, time will be computed from the first 7:00 A. M. after actual or constructive placement on such interchange tracks until return to the same or another interchange track * * *." We are of the opinion that the Pine Bluff Arsenal was an "industrial plant" within the meaning of the portion of the tariff just quoted, that the facts that the interchange tracks were owned by the Government and the switching services were performed by it, rather than by a private concern, are immaterial, and that delivery on the interchange tracks at Baldwin was delivery to the defendants. The same question was before the Court in Chicago, Burlington & Quincy Railroad Co. v. Blunk, D.C.Iowa, 101 F.Supp. 219, where the cars in question were delivered upon Government owned and operated interchange tracks at the Iowa Ordinance Works, and it was there held that delivery upon the inter-

change tracks was delivery to the consignee.

█ The contention is made that the plaintiff cannot prevail because no notice was given the defendants of the arrival of cars at the interchange tracks. Rule 4, Section C, of the tariffs provides, subject to an exception not applicable here,[4] that delivery "upon other than public delivery tracks or upon industrial interchange tracks * * * will constitute notification to consignee". We are satisfied that the interchange tracks at Baldwin were not "public delivery tracks" and that they were "industrial interchange tracks" within the meaning of the aforementioned rule; hence, no notice of delivery upon said tracks was required.

The decision of the Interstate Commerce Commission in the case of Madsen Construction Co. v. Great Northern Ry. Co., 231 I.C.C. 283, is in point on this phase of the instant case, and highly persuasive. In that case the Government had built a line of railroad from a dam site near Fort Peck, Minnesota, to the town of Wiota, a point on the lines of the Great Northern; at Wiota a system of interchange tracks had been built by the Government; shipments consigned to the dam site would be delivered by the carrier upon the interchange tracks at Wiota from which they would be hauled to the dam site by Government equipment, and after unloading the cars would be returned by the Government to said interchange tracks. In a controversy over demurrage it was contended, as it is contended here, that the consignee was entitled to notice of the placement of cars on the interchange tracks at Wiota. In rejecting this contention the Commission said: "Under the situation disclosed by these facts, defendant could effect delivery of cars only at Wiota. Complainants, there-fore, availed themselves of the only means of receiving their freight at Wiota, transporting it to the place of unloading at the dam site, and returning the empty cars to Wiota for delivery to defendant * * *. That the tracks in the receiving yard at Wiota were other than public delivery tracks there can be no doubt. They were private tracks and delivery by defendant of the cars on those tracks constituted notice to complainants * * *." The same result was reached in Chicago, Burlington & Quincy R. Co. v. Blunk, supra.

The interchange tracks at Baldwin were built not to serve the public generally but to serve the shipments of freight destined for the contractors and the private industries operating within the arsenal area. We think the fact that these tracks were built and owned by the Government, and the fact that the Government did the switching and spotting, are immaterial with respect to the necessity for notice as well as with respect to the fact of delivery. In a broad sense the Pine Bluff Arsenal is an industry; in this connection, it appears from the opinion in the Blunk case, supra, that the Iowa Ordinance Plant at West Burlington, Iowa, was included on the railroad's tariff "as one of the industries located at West Burlington, Iowa, a station on plaintiff's line." 101 F.Supp. at page 271.

A more serious question raised by the defendants involves their contention that they should be excused from liability for demurrage because the failure to get the cars back to Baldwin within the allowed free time was not due to any fault on their part, but was entirely due to the fault of the employees of the Corps of Engineers. It has been held that where the proximate cause of the failure to get freight cars back to the railroad within the free time is not the fault of the shipper or consignee, but is due to the intervention of an act of God

4. The exception to Rule 4, Section C, refers to cases in which a Note following Rule 3, Section E, is applicable. This Note is as follows: "Where two or more parties each with its own power take delivery from the same interchange track, or where this railroad company uses the interchange track for other cars, or where the interchange track is not adjacent to the plant and the industry uses this railroad's tracks to reach same, a notice of placement shall be sent or given to the consignee and time will be computed from the first 7:00 A. M. thereafter." None of the situations set forth in said Note existed at Baldwin at any of the times pertinent to this case.

or a *vis major,* the shipper or consignee is excused from his obligation to pay demurrage, Southern R. Co. v. White, 6 Cir., 284 F. 560, 26 A.L.R. 1429; Chesapeake & O. R. Co. v. Board, 100 W.Va. 222, 130 S.E. 524, 44 A.L.R. 826; and Rule 8 of the tariffs themselves provides for a remission of demurrage under certain conditions. But the defendants were not prevented from returning the cars within the free time by an act of God or a *vis major,* and they have failed to bring themselves within any of the exceptions set forth in the tariffs. Hence, the cases just cited are not squarely in point, and the exceptions contained in Rule 8 afford no relief to the defendants.

It is at least arguable, however, that where a shipper or consignee, without fault or neglect on his part, is prevented from returning the cars within the allowed free time by reason of the intervention of Government employees, acting within the scope of their authority, which intervention he could not have reasonably foreseen or guarded against, he should not be held liable for demurrage, the duty to pay which is generally considered as imposed by law rather than by virtue of the contract between the parties. In this connection in an annotation in 44 A.L.R. 829, entitled, "Demurrage as affected by insurrection or act of public authorities", it is said: "It has been generally held, also, that where performance of the contract becomes impossible by reason of law or acts of the public authorities subsequent to the making of the contract, such acts excuse nonperformance, if they should not reasonably have been anticipated and guarded against. It will be observed that this rule, which applies in case of express contracts, would seem a fortiori to apply to recovery of demurrage, which, as above indicated, may be regarded as arising from an obligation imposed by law, rather than direct contract of the parties." The following cases are cited by the annotator as supporting this view: Southern R. Co. v. Wallace, 175 Ala. 72, 56 So. 714; J. H. Labaree Co. v. Crossman, 100 App.Div. 499, 92 N.Y.S. 565, affirmed without opinion, 184 N.Y. 586, 77 N.E. 1189; and Evans v. Hutton, 4 Mann. & G. 954, 134 Eng.Reprint, 391.

Assuming, without deciding, that this proposition is sound, it nevertheless appears that such is not applicable unless the intervention of the Government officials or employees was the proximate cause of the incidence of demurrage nor unless it further appears that such intervention could not have been reasonably foreseen and guarded against; and here, in our opinion, the defendants have failed to bring themselves within the rule.

In the first place, while it may be said that the failure of the defendants to return the cars in time was due in many instances to the method of operation employed by the Corps of Engineers, over which neither party hereto had any control, the evidence does not show that such method of operation or the dilatoriness of the Government employees was the proximate cause of the delay in the return of all of the cars with respect to which there is a claim for demurrage. It will be recalled in this connection that the defendants' unloading equipment was broken down and out of operation for two days, which obviously delayed the return of certain cars, which delay cannot be attributed to the Government; and it appears to us as a practical matter that with so many cars being handled over a two-months period, there must have been other instances in which delay was brought about by factors other than the Government's method of operation or dilatoriness. As stated, the Government was not always dilatory, but in many instances moved with unquestionable dispatch. No evidence was introduced by the defendants for the purpose of showing, on a car by car basis, the reason for the incidence of demurrage, and it is impossible for us to differentiate between the cars which were not released within the free time because of the fault of the Government and other cars the delay in the release of which was due to other causes. Under such circumstances any effort on our part to apply the rule in question to any particular car or cars would be pure speculation, and since it cannot be applied to all of the cars with respect to

which demurrage is claimed, it cannot, under the evidence before us, be applied to any of such cars.

Secondly, we are not satisfied that the defendants could not have in many instances avoided the demurrage here claimed by controlling the flow of gravel from Bearden to Baldwin. Defendants obviously became familiar with the Government's methods of operation and switching practices quite soon after they commenced performance of their sub-contract; the probability of delay in the spotting, unloading and return of cars was an obvious one, and ordinary prudence and diligence would, in our opinion, have required the defendants to take some steps to reduce or control the movement of gravel to them; but there is no evidence that any such steps were taken by the defendants, although the gravel belonged to them and was under their control. This being true, defendants are not in any position to invoke the rule under consideration.

It may well be that to hold the defendants liable for at least a part of this demurrage will, in a sense, work a hardship on them; but it is settled law that from a legal standpoint hardships and inequities do not excuse one from his duty to pay demurrage. Baldwin v. Scott County Milling Co., 307 U.S. 478, 485, 59 S.Ct. 943, 83 L.Ed. 1409, and cases there cited.

Judgment in accordance with the foregoing will be entered.